Craig FORD, Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOP-MENT and United States Civil Service Commission, Defendants.

No. 77 C 3736.

United States District Court,
N. D. Illinois, E. D.

April 27, 1978.

Judson H. Miner, Chicago, Ill., for plaintiff.

Thomas P. Sullivan, U. S. Atty., Chicago, Ill., Martin B. Lowery, Deputy Chief, Civ. Div., Asst. U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

MAROVITZ, Senior District Judge.

### Motion to Dismiss and Cross Motions for Summary Judgment

Plaintiff Craig Ford, a former employee of the Department of Housing and Urban Development ("HUD"), brings this action to review his discharge from the position of Special Assistant to the Area Director of HUD's Chicago Area Office, which became effective on November 12, 1975. Plaintiff seeks reinstatement, back pay, reasonable attorney's fees and costs. Plaintiff alleges, *inter alia,* that the decision of the Federal Employee Appeal Authority of the Civil Service Commission (the "Commission") which affirmed his discharge was arbitrary and capricious, both in substance and procedure. Plaintiff specifically alleges that the Commission wrongfully placed the burden on plaintiff to disprove the charges lodged against him by HUD and alleges further that the Commission's decision was not supported by any competent evidence and contained numerous errors of law.

Pending before the Court is defendants' motion to dismiss for want of jurisdiction over the person of any defendant, Rule 12(b)(2), F.R.Civ.P., and defendants' and plaintiff's cross motions for summary judgment. Rule 56, F.R.Civ.P. Defendants HUD and the Commission are named under 5 U.S.C. § 703 and jurisdiction is invoked pursuant to 28 U.S.C. § 1331.

For the reasons set forth below, defendants' motions to dismiss and for summary

judgment are denied. Plaintiff's cross motion for summary judgment is granted.

## I.

### FACTUAL BACKGROUND

Plaintiff began his career with HUD as a program specialist in the Indianapolis Area Office in January 1971. There is no dispute that for more than five years, until the incident at issue here, plaintiff had served the agency in a satisfactory manner and that his employment record is totally devoid of any disciplinary infractions or serious conflicts with his superiors. In fact, there was considerable testimony at plaintiff's appeal hearing that plaintiff's work with members of the Chicago Area community was exemplary. *See, e. g.,* Testimony of Gregory Martin Heine, Tr. 17–18; Testimony of Clyde H. Brooks, Tr. 21–23; Testimony of Harold Williams, Tr. 42–43; Testimony of Leo F. Hickman, Tr. 61.[1] In September 1973, plaintiff became the Director of the Equal Opportunities Division of the Chicago Area Office, after he was detailed to that office as an Equal Employment Opportunities ("EEO") specialist on July 2, 1972. In December 1973, plaintiff was promoted from salary grade GS–12 to GS–13.

Plaintiff received notice of a proposal to discharge him from his position, signed by his superior, on September 30, 1975. The proposal to discharge charged plaintiff with (1) misuse of a Government vehicle; (2) "[p]ractice of deception by knowingly and willfully signing a subordinate employee's name to a GSA trip ticket"; (3) "[i]nsubordinate conduct, by reason of [his] failure to report for duty at the officially designated time"; and (4) "[c]onduct that was both irresponsible and unbecoming a Federal official." Plaintiff denied each charge in substance in an oral reply on October 24, 1975 (a summary thereof appears at R. 56–59, *see also,* R. 54–56) and in a signed statement to Don Morrow, Acting Regional Administrator of HUD (R. 60–67).

On November 7, 1975, the Regional Administrator issued his memorandum decision advising plaintiff that he found the charges in the notice of September 30, 1975 to be fully supported by the evidence and that the charges warranted plaintiff's discharge (R. 51–53). Plaintiff was also advised of his right to appeal (*Ibid.*).

Although plaintiff's appeal to the Commission was untimely filed, it was accepted upon his explanation that the appeal had initially been sent in error to his employing agency (R. 101). At plaintiff's appeal hearing, which was convened on January 17, 1977, HUD relied solely on the evidence that was presented to the Regional Administrator. That evidence included the unsworn summary of an investigation conducted by a Mr. Zigler, a HUD employee; two newspaper clippings; a letter from a HUD secretary to a third party, two unsworn summaries of interviews with other employees; two GSA trip tickets; a copy of a HUD Federal Property Management Regulation; and the report of Federal Protective Officer Searles (R. 56–71).

HUD declined to offer any witness to support its charges at plaintiff's appeal hearing (Tr. 4). Plaintiff also filed a complaint of racial discrimination, pursuant to Section 713.216 of the Civil Service Regulations, at the same time he filed his appeal. See, R. 142–238. Plaintiff did not pursue his charge at the appeal hearing, on his attorney's advice that the affirmative defense of racial discrimination need not be raised because the evidence brought against plaintiff was insufficient to support his termination (Tr. 123).

Plaintiff called nine witnesses to testify on his behalf during the first day of his appeal hearing (Tr. 6–112). The hearing was reconvened on February 10, 1977, at which time plaintiff was represented by legal counsel. Counsel argued, *inter alia,* that the Government had the burden to prove each of the four charges lodged against plaintiff and that the Government's

---

1. Consistent with plaintiff's memoranda, citations of (R. _____) are citations to Volume I of the Administrative Record. Citations of (Tr.

_____) are citations to the transcript of the appeal hearing before the Commission, Volume II of the Administrative Record.

evidence was insufficient and did not include any sworn statement from any witness against plaintiff (Tr. 118–123). Plaintiff then rested his case (Ibid.). HUD declined to offer any witness or additional evidence in rebuttal.

On August 3, 1977, the Commission entered its decision sustaining HUD's discharge of plaintiff. The Commission's decision affirmed the Regional Administrator's findings as to Charges 1–3 and part of Charge 4. Memorandum Decision of the Commission at R. 1–13. This action followed.

## II.

## JURISDICTION

■ The Government contends that both HUD and the Commission, which are sued in this action *eo nomine,* should be dismissed as improper party defendants. Relying on *Blackmar v. Guerre,* 342 U.S. 512, 515, 72 S.Ct. 410, 96 L.Ed. 534 (1952) and *Bell v. Groark,* 371 F.2d 202, 204 (7th Cir. 1966), the Government argues that only individual members of the Federal Employee Appeal Authority board who decided plaintiff's administrative appeal are proper parties to an action for review. Both cases do stand for that proposition, and the Court notes authority as recent as 1975 which follows that line of decisions. *See, e. g., ESP Fidelity Corporation v. Department of Housing and Urban Development,* 512 F.2d 887, 890 (9th Cir. 1975).

Nevertheless, *Blackmar v. Guerre, supra,* and its ensuing line of cases are no longer good law in light of the 1976 amendment to the "form and venue of proceeding" section of the Administrative Procedure Act, 5 U.S.C. § 703. That statute now provides:

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. *If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.* Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement. 5 U.S.C. § 703 (emphasis added).

The purpose of the statute was set out in House Report No. 94–1656, which states in pertinent part:

Further, the bill would simplify technical complexities concerning the naming of the party defendant in actions challenging Federal administrative action by amending section 703 of title 5, to permit the plaintiff to name the United States, the agency or the appropriate officer as defendant. This will eliminate technical problems arising from plaintiff's failure to name the proper Government officer as defendant. H.Rep.No. 94–1656, 94th Cong., 2d Sess., 1976 *U.S.Code Cong. & Admin.News* at pp. 6121–6122.

*See also, Ibid.,* at 6137–6138.

Accordingly, defendants' motion to dismiss for lack of jurisdiction over the person of the defendants and for failure to join the individual members of the Commission as indispensible parties is denied.

## III.

## SCOPE OF REVIEW

■ The parties do not dispute the limited scope of review by a district court of a federal employee discharge proceeding. The Court's determination can be based only on the agency's record submitted to it. *Polcover v. Secretary of Treasury,* 155 U.S. App.D.C. 338, 340–341, 477 F.2d 1223, 1225–1226 (1973). The duty of this Court is to determine whether the Commission had followed the required procedures and that the Commission's action was not arbitrary nor capricious. *Pauley v. United States,* 419 F.2d 1061, 1065 (7th Cir. 1969). This test

does not require the agency's decision to be supported by "substantial evidence" but rather that the decision be supportable on any rational basis. *Wood v. United States Post Office Department,* 472 F.2d 96, 99 (7th Cir. 1973) *cert. denied,* 412 U.S. 939, 93 S.Ct. 2775, 37 L.Ed.2d 399 (1973). See generally, *Wroblaski v. Hampton,* 528 F.2d 852, 853 (7th Cir. 1976).

■ While it is clear that the scope of review by this Court is narrow, we agree with plaintiff that the amount or type of evidence required to satisfy the rational basis test has yet to be determined in this Circuit. We also agree that the Seventh Circuit's recent decision in *Young v. Hampton,* 568 F.2d 1253 (7th Cir. 1977) clearly places the burden of proof on the agency in a disciplinary or discharge proceeding. In *Young,* the Court reversed the discharge of a federal employee, because of his conviction for possession of marijuana, because the Government failed to prove that his discharge " 'will promote the efficiency of the service.' "

As plaintiff argues, the Court of Claims has consistently held that unsworn, hearsay evidence is not sufficient to support a removal decision. See *Reil v. United States,* 456 F.2d 77, 780–781, 197 Ct.Cl. 542 (1972) and cases cited therein. While *Reil* and its predecessors employ the substantial evidence standard, it is clear that a court should scrutinize hearsay testimony, particularly where it is unsworn. The hearing examiner in plaintiff's appeal, himself, stated that hearsay testimony is not necessarily excludable, but must be judged for its probative value in light of the total record (Tr. 9). Further, the examiner implied that the probative value of hearsay is further reduced if it is uncorroborated (*Ibid.*). It should be noted that the examiner's discussion of the probative value of hearsay evidence was made in reference to evidence that plaintiff sought to present in his defense.

■ Finally, while this Court must affirm the decision of the Commission if the record shows a rational basis for plaintiff's discharge, where none of the evidence adverse to plaintiff consists of sworn testimony, this Court should scrutinize the credibility of that evidence. We agree with plaintiff's contention that the evidence itself must "reveal sufficient assurance of its truthfulness" to support a rational basis. *Pascal v. United States,* 543 F.2d 1284, 1289 (Ct.Cls.1976).

### IV.

■ The first charge which resulted in plaintiff's termination reads as follows:

(1) Violation of the Federal Property Management Regulation, "Official Use of Government Motor Vehicles and Related Pool Services," Subchapter G, of Subpart 1–1–39.602.1

(1) Specifically, you are charged with unauthorized extended use of GSA vehicle No. 12–27742, from January 8, 1975 to February 11, 1975 and vehicle No. 12–22458, from March 11, 1975 to April 11, 1975. During the above mentioned time periods, you are charged with the use of the above mentioned vehicles to transport yourself between the Chicago Area Office and your place of residence. This is in direct violation of [the] Federal Property Management Regulation, . . .

The regulation which plaintiff is charged with violating states:

Officers and employees of the Government shall use Government owned or leased vehicles for official purposes only. "Official Purposes," does not include transportation of an officer or employee between his place of residence and place of employment unless authorized under the provisions of 31 U.S.C. 638a(c)(2) or other applicable law. . . . Any officer or employee who willfully uses or authorizes the use of such vehicle for other than official purposes is subject to suspension or removal by the head of his agency.

The Commission relied exclusively on HUD Investigative Report EO–4–12, dated August 14, 1975 by Wayne D. Zigler, as proof of the first charge. According to Zigler, plaintiff admitted driving a GSA

vehicle between his home and office. The Commission assumed that since the vehicle was in plaintiff's possession between January 8 and February 11, 1975, that a large portion of the 661 miles logged on the vehicle "was for the purpose of driving between [plaintiff's] place of residence and the HUD office." (R. 5). Also in the record is an unsworn statement by a Mr. Fred Rucker that he saw a GSA vehicle in front of plaintiff's home (R. 89).

Plaintiff does not dispute that he did bring the GSA automobile to his home, but rests his defense on the fact that the occasions in which he did bring the vehicle home, he had to use the vehicle for Government work either after working hours or early the next day. At plaintiff's appeal hearing, there was considerable testimony that plaintiff had to attend a number of functions in outlying areas during the evening. See, e. g. Tr. 15, 23, 38.

Mr. Rucker, whose statement to the HUD investigator was used as evidence against plaintiff, testified on plaintiff's behalf at his hearing, by way of a sworn affidavit read into the record:

"First of all, it is my understanding that the Area Office permitted the use of GSA cars on a monthly basis for the Equal Opportunity Office. No arrangements were made for overnight parking in one of the nearby garages. The Equal Opportunity Office needed the car on a daily basis due to many required meetings outside of the Area Office. In my opinion *it was not feasible to return the cars to the Motor Pool each night and then check it out the following morning."* (Tr. 49) (emphasis added).

Charles J. Mabus, Director of the Equal Opportunity Division of the Chicago Area Office of HUD, testified about the Federal Property Management Regulation which plaintiff allegedly had violated (Tr. 64–83). While Mabus was the Director of Administration, he issued the regulations governing the use of Government vehicles (Tr. 64). He indicated that the use of GSA vehicles for "three-legged" trips, i. e., from office to place of official business to employee's resi-

dence to office, was exempt from the mandate of the regulation:

"The regulations provide that Government vehicles are not to be used for transportation directly back and forth between a person's residence and place of duty, where ever that is, however, there are many instances of what I refer to as the three-legged trip where an employee either, after leaving the office goes to a meeting or another official appointment and then to his residence or goes from the office to his residence going to an early morning meeting somewhere else other than the office." (Tr. 73).

While plaintiff provided considerable evidence that he attended a number of official functions after his working hours, the Government offered only the statement of plaintiff's supervisor, John Waner, that to his knowledge, there were no evening assignments (Tr. 103). It should also be noted that plaintiff refused to sign his alleged admission to Zigler. Further, counsel for plaintiff attests that Zigler himself did not sign nor swear to his Summary of Investigation. Affidavit of Judson H. Miner, ¶¶ 2–3. *See also*, R. 85–87.

While we agree with defendants that plaintiff's admission is not hearsay, see Rule 801(d)(2)(A), F.R.E., there are too many exigent circumstances surrounding the alleged admission for this Court to find a rational basis for plaintiff's discharge on Charge No. 1. First, plaintiff did not sign any statement made to Zigler, although he was apparently asked to sign a written statement. Second, Zigler did not sign, nor swear to, the Summary of Investigation upon which the agency relied. Third, there is no evidence that plaintiff used a Government vehicle for personal use. The evidence strongly supports plaintiff's contention that the intent of the regulation is not aimed at precluding the type of use plaintiff made of the Government vehicles. Finally, while John Waner, the officer who initiated the proceeding against plaintiff, stated that he was unaware of any evening assignments, he did not state that they did not exist, nor that plaintiff did not partici-

pate in official business outside the Area Office after working hours. The sworn testimony of a number of disinterested parties clearly shows that plaintiff did function on the behalf of HUD on a number of occasions in outlying areas, after hours.

In light of our finding that there is no reliable evidence which supports the charge that plaintiff used a Government vehicle for personal reasons, and in light of the substantial evidence that plaintiff only brought the vehicle home while engaged in "three-legged" trips on behalf of the agency, we hold that there is no rational basis on which to sustain the Commission's decision as to Charge No. 1.

■ The second charge upon which HUD based plaintiff's discharge reads as follows:
(2) Practice of deception by knowingly and willfully signing a subordinate employee's name to a GSA trip ticket, form number 312, to withdraw a GSA vehicle. (2) You are charged with the practice of deception by knowingly and willfully signing a subordinate employee's name to a GSA trip ticket to withdraw GSA vehicle No. 12–27742. Specifically, you admitted to investigator Zigler in an interview with him on June 19, 1975, that you did in fact sign Margarita Garcia's name to a GSA trip ticket for the purpose of withdrawing a GSA vehicle from the motor pool located at 701 South Clinton Street, Chicago, Illinois.

In support of this charge, the Commission again relies solely on the contents of the summary of investigation prepared by Zigler (R. 8). The summary states that plaintiff admitted that he had signed Ms. Garcia's name on January 8, 1975 for purposes of obtaining a GSA vehicle. The Commission also noted that the signature of Ms. Garcia on the January 8, 1975 trip ticket was "totally unlike the representation of her true signature as it appears on the GSA trip ticket dated March 11, 1975" (R. 8).

Plaintiff denies ever having deceived anyone (R. 57, 60). He argues that it would be ludicrous to expect that he could deceive members of the GSA motor pool by representing himself as Ms. Garcia. Further, at plaintiff's appeal hearing, John C. Thompson, former director of the Equal Employment Opportunities Division of HUD testified about the practice of obtaining vehicles from the Government motor pool (Tr. 35–36). Thompson testified that employees were not allowed to sign out a vehicle for two consecutive months. Because only one person in the division would need a vehicle for his or her function, it was common practice for another employee to sign out a vehicle in that person's behalf when that person had signed out the vehicle for the prior month (Tr. 35).

Fred Rucker testified that it would have been impossible for plaintiff to pass himself off as Ms. Garcia at the motor pool (Tr. 50). Charles J. Mabus, Director of Administration while plaintiff was employed by HUD, corroborated Thompson's testimony, and stated that he encouraged the policy of having one person sign for a vehicle where another person needed to use it but could not sign for it because he or she had done so for the prior month (Tr. 77). Mabus also testified that the people at the motor pool were familiar with plaintiff (Tr. 77).

Given the evidence against plaintiff and the rationale upon which the Commission found this charge as a basis for plaintiff's termination, the Court cannot find Charge No. 2 to be a rational basis for plaintiff's discharge. First, it is clear, given the *de facto* policy of the Equal Employment Opportunities Division, that even if plaintiff had signed Garcia's name to the GSA trip ticket, his act was done to further the purpose and function of his division. It is undisputed on the record that plaintiff was the division member who was charged with the duty to attend functions and meetings which required the use of a Government vehicle (Tr. 53). Second, it is clear on the record that no one was deceived by plaintiff's alleged act and that plaintiff did not intend to deceive.

The evidence to support the charge is so unsubstantial as to preclude even a finding that plaintiff did sign Garcia's name, regardless of his motive and the propriety of

such an action. While Zigler's summary of investigation states that Garcia did not recall signing out the vehicle at the time plaintiff is alleged to have done so, neither Garcia nor Zigler were called as witnesses at plaintiff's hearing. Further, neither Garcia's nor Zigler's statements were sworn. In fact, the record is devoid of any direct evidence that plaintiff did sign Garcia's name. The circumstantial evidence, that plaintiff was in possession of the vehicle signed out to Garcia, is inconclusive in light of the Equal Opportunities Division's policy to give a vehicle to whoever was in need of a vehicle, regardless of who signed for it. The hearing examiner who found that the signature on the disputed GSA ticket was unlike another signature, allegedly Ms. Garcia's, did not testify that he was familiar with Garcia's signature, that he had any expertise in handwriting analysis, or that the handwriting indicated that it was plaintiff who signed Garcia's name.

In light of the foregoing, we hold that there is no rational basis in the evidence upon which to sustain the Commission's finding as to Charge No. 2.

■ The third charge upon which the Commission sustained plaintiff's discharge reads as follows:

(3) Insubordinate conduct, by reason of your failure to report for duty at the officially designated time as directed.

(3) You are charged with insubordinate conduct during the period August 19, 1975, to August 20, 1975, by virtue of the fact you failed to report for duty in the reassigned position of Special Assistant to the Area Director. Specifically, on the morning of August 19, 1975, you were officially advised in a meeting with Martin R. Rogan, Deputy Director, Chicago Area Office, that you. were being reassigned from your position of Director, Equal Opportunity, to Special Assistant to the Area Director. Further, you were notified that you were to report for duty in the new assignment effective 8:15 a. m. on August 20, 1975.

Your response to this official notification was to indicate that you did not desire to

report for duty as directed. Subsequently, the morning of August 20, 1975, at 8:15 a. m. found you barricaded in your office and refusing to leave the office space. Your conduct during this period of time was clearly insubordinate to the lawful directives of your superiors in that you refused and failed to report for duty as directed.

Little need be said about Charge No. 3, since absolutely no evidence was offered to support its allegations. As the Court of Appeals directed in *Young v. Hampton, supra,* a charge cannot be sustained if a crucial element of that charge is wholly unsupported by evidence. Here, plaintiff is charged with failing "to report for duty at the officially designated time as directed." There is no evidence, either by way of testimony, affidavit or any other document, that plaintiff had been ordered to report to a specified place at 8:15 a. m. on August 20, 1975. Plaintiff had absolutely no evidence presented against him to which he could have responded.

Accordingly, we hold that there is no rational basis in the evidence upon which to sustain Charge No. 3 as grounds for plaintiff's discharge.

The fourth and final charge against plaintiff reads as follows:

(4) Conduct which was both irresponsible and unbecoming a Federal Official.

(4) You are charged with conduct which was both irresponsible and unbecoming a Federal Official. Specifically, between the dates of August 19, 1975, and August 20, 1975, after having been officially advised that you were being reassigned to a new position as Special Assistant to the Area Director, you subsequently went to your office and telephoned the news media and alleged that you were being illegally and discriminatory (sic) reassigned from your duties as Director of Equal Opportunity, Chicago Area Office.

Your subsequent actions on August 19, upon the arrival of the news media, specifically, ABC, CBS, and NBC Television news teams and the *Chicago Tribune* and *Sun Times* newspapers, were to allege to

the assembled media that you were being illegally removed from your position and that it was your intention not to accept the new assignment and also not to allow yourself to be removed from your office and your position of Director of Equal Opportunity.

Further, during the time you were locked in your office, specifically, August 19, 1975, you telephoned the office of Assistant Secretary for Fair Housing and Equal Opportunity Blair and made threatening remarks. In a letter dated August 21, 1975, to Hugh L. Gauntt, Regional Inspector General, Ms. Phyllis Wiley, Executive Assistant to the Assistant Secretary, states that, in her telephone conversation with you on August 19, you stated that you had a gun and would shoot anyone who tried to remove you from your office. In the GSA Security Police report of August 20, 1975, it states that, "It was believed that Mr. Ford was armed with a pistol and dangerous."

Your behavior and conduct during the stated time frame was clearly of an irresponsible nature and caused a feeling of anxiety and concern to exist among your superiors and your fellow employees.

Your behavior was one of over-reaction and over-response where it was clearly obvious that you had administrative recourse available to you if you desired to object to the new assignment. Involving the news media in internal administrative matters gave undue notoriety to the entire episode and made it necessary for the office Director to request the GSA Security Police to remove you from the office in which you had locked yourself. The condict described above can only be regarded as irresponsible and unbecoming a Department Division Manager (R. 9–10).

The Commission treated the specifications to Charge No. 4 as three basic allegations: (1) that plaintiff called the press and told them that he had been illegally and discriminatorily reassigned; (2) that plaintiff permitted himself to be interviewed by the press on August 19, 1975; and (3) that plaintiff locked himself in the office, made threatening remarks and was removed from

his office by Government security police. The Commission's decision specifically rejected the first two allegations concerning plaintiff's contact and interview with the press (R. 11).

The Commission did, however, sustain the third portion of the charge. The Commission relies on a letter from a Ms. Wiley, a HUD secretary, wherein she reported that plaintiff mentioned during a telephone conversation that he had a gun and he would shoot anyone who tried to remove him from his office (R. 11). The Commission noted that plaintiff did not call Ms. Wiley as a witness to refute the allegation, and therefore concluded that the letter was reliable evidence (R. 11). The Commission also noted that the report of Officer Searles, and plaintiff's own admission, confirmed the allegation that plaintiff was accompanied from his office by a security guard.

■ We agree with plaintiff that the evidence that plaintiff was armed and threatening is, at best, inconclusive. The letter of Ms. Wiley to Mr. Gauntt is the most unreliable sort of hearsay. The Commission's reasoning, that plaintiff's failure to call Ms. Wiley as a witness lends credence to the letter, improperly places the burden of proof on plaintiff. See *Young v. Hampton, supra. Cf., Prince Mfg. Co. v. United States*, 437 F.Supp. 1041, 1045–46 (N.D.Ill. 1977) (Marovitz, J.).

■ There is, however, substantial evidence that plaintiff was escorted from his office by Officer Searles (R. 94–95). Searles' official report states that he made a physical search of plaintiff, found him unarmed and escorted plaintiff out of his office (*Ibid.*). Plaintiff admits that he was escorted from his office, but contends that "[t]here was no need to summon GSA guards" (R. 58).

In light of the evidence on the record, we hold that there was a reasonable basis on which to find that plaintiff had to be escorted from his office by a security guard. However, given the fact that this Court finds three of the four charges against plaintiff to be without a reasonable basis,

the Court is in no position to sustain plaintiff's discharge. On the other hand, given our narrow scope of review, we cannot order reinstatement while one charge against plaintiff is still in dispute.

We therefore remand this cause to the Civil Service Commission to determine whether the incident that occurred on August 19–20, 1975 provides a reasonable basis for plaintiff's discharge.[2] See *Braniff Airways, Inc. v. Civil Aeronautics Board*, 126 U.S.App.D.C. 399, 413, 379 F.2d 453, 467 (1967) ("Reconsideration is the obvious opportunity available to an agency to cope with defects appearing on its first consideration.")

In closing, it should be noted that the Court refuses to join plaintiff in speculating about the actual motive for his discharge. Plaintiff's counsel refused to pursue the counter-charge of racial discrimination at plaintiff's appeal hearing. Plaintiff did not offer substantial evidence to show that his discharge was in retaliation for his criticism of the HUD hierarchy. This Court should not comment on counsel's tactical decisions at the appeal hearing. However, we note that all viable defenses should be raised at the administrative level, rather than upon review by a district court.

### V.

In light of the foregoing, plaintiff's cross-motion for summary judgment is granted in part and defendants' motions to dismiss and for summary judgment are denied. The cause is remanded to the Civil Service Commission for reconsideration.

---

**2.** The Court specifically refers to the charge that plaintiff locked himself into his office and had to be forcibly removed. Consistent with this opinion, the Commission should consider whether it deems the evidence sufficient to support the charge, whether any exigent circumstances exist and whether the charge, if proved, provides a rational basis for plaintiff's discharge.